In re SENTRY OPERATING
COMPANY OF TEXAS,
INC., et al., Debtors.

Sentry Operating Company of Texas, Inc., Sentry Operating Company, Amey Funeral Home, Inc., Sentry Operating West, Inc., Sentry Group Services, Inc., Funeral Service Management, Inc., Sentry Operating Company of New Mexico, Inc., Sentry Services

---

Agency, Inc. of New Mexico, Cremation Society of Oklahoma, Inc., Sentry Operating Company of Colorado, Inc., Sentry Services Agency, Inc.—Del., Sentry Operating Company of Kansas, Inc.

Nos. 01–60129–V2–11 to 01–60140–V2–11.

United States Bankruptcy Court,
S.D. Texas,
Victoria Division.

June 19, 2001.

Edward L. Rothberg, Houston, TX, for debtor.

Daniel F. Patchin, Houston, TX, for Stumpff Families.

Lenard M. Parkins, Houston, TX, for Seacoast Capital.

Peter Johnson, Houston, TX, for Gerald Pace.

Kiran Phansalkar, Oklahoma City, OK, for Billings Wharton and Fisher.

Diana M. Woodman, Houston, TX, for Walter Rabun.

Thomas Grace, Houston, TX, for SCI Loan Service.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW CONCERNING CONFIRMATION OF CHAPTER 11 PLAN (doc # 84 and 102)

WESLEY W. STEEN, Bankruptcy Judge.

In this contested matter, the Court must decide whether to confirm a chapter 11 plan over the objection of a class of unsecured creditors that has rejected the plan. These creditors argue (i) that they cannot be classified separately from other creditors of equal rank, and (ii) that a chapter 11 plan cannot be confirmed over their rejection and objection if it proposes to pay them a lesser percentage than it proposes to pay other creditors of equal rank. The Court concludes that separate classification of creditors with similar claims is permissible if necessary for the plan to effect a distribution scheme that is statutorily permissible, but the definition of the classes must be narrowly and carefully drawn. The Court also concludes that the plan proponents have not met their burden to prove that the class definitions are drawn sufficiently narrowly and have not met their burden to prove that the plan does not discriminate unfairly.

### FACTS

The Debtors are a group of affiliated companies that own and operate about 38 funeral homes, two crematoria, and one cemetery located in small communities spread across five states. The Debtors began to acquire independent, small-town funeral homes in 1995. Typically the purchases involved some cash, a note, and a non-compete agreement with existing management. When vendor financing was involved, the debt to the vendors (Subordinated Vendors) was subordinated to the secured debt to the banks, but there are variations and disputes with respect to the vendor subordination agreements. The Debtors' senior secured lenders were two banks that held liens and security interests pursuant to a Credit Agreement. Seacoast Capital Partners, L.P., CCG Venture Partners, LLC, ABN Amro Private Equity, and LDI Ltd. (the "Equity Investors") hold the equity interests in the Debtors.

In May 1998, the Debtors' parent and the Equity Investors signed a Note and

Warrant Purchase Agreement[1] under which the Equity Investors agreed to purchase approximately $2,000,000 of Senior Subordinated Notes[2]. The notes were subordinated to the Senior Indebtedness owed to the banks, defined as "all amounts (not to exceed $20,000,000 million (sic) in the aggregate at any time outstanding) ... owed pursuant to the Credit Agreement."[3] In their capacity as creditors, the Equity Investors are referred to as Subordinated Investors.[4] The Notes state that:

- "This Note and all payments in respect hereof shall not be subordinated and junior in right of payment to any other obligations of the Corporation other than the Senior Indebtedness."[5]
- "During the continuance of any default in the payment of any Senior Indebtedness ... no direct or indirect payment of any kind shall be made with respect to ... this Note, and the holder of this Note shall not accept any such payment and shall take no action ... to obtain any such payment or otherwise to enforce this Note ..."[6]
- In case of liquidation of the corporation (whether in bankruptcy or otherwise), any payment due the noteholders shall instead be paid to the Senior Indebtedness.[7]
- The noteholders agree that they will not vote their claims "... in a man-

ner inconsistent with the terms of this Section 10."[8]

In August, 1998, SCI–L[9] lent about $14 million under the Loan Agreement[10] to pay off the existing bank debt. SCI–L succeeded to the rights of the banks as the Senior Indebtedness.[11] In 1999, SCI–L advanced an additional $21 million to the Debtors under the Loan Agreement. The SCI–L debt is secured by a lien and security interest in all assets involved in these cases.

The Loan Agreement and related documents include a Voting Agreement and Irrevocable Proxy under which SCI–L had the right to elect new directors of the corporation in the event of a default.[12] In March 2001, SCI–L exercised these rights. The new directors are principally employees of SCI–L or its affiliated companies. The new directors voted to file this bankruptcy case. The Debtors and SCI–L jointly proposed the Plan.

The Plan would substantively consolidate the Debtors and liquidate the assets, by sale of 27 of the funeral homes to SCI–L. SCI–L agrees to pay for these assets by: (i) allowing the debtor to use cash on hand (which is SCI–L's cash collateral) to make payments to some creditors under the plan, and (ii) by credit bid of SCI–L's claim against the Debtors. Eleven of the

1. See Seacoast Exhibit 3.

2. See Seacoast Exhibits 4–9. These exhibits will hereafter be referred to as "Notes".

3. Notes, section 10.

4. See Seacoast Exhibit 9, Schedule XI.

5. Notes, paragraph 10.

6. Id.

7. Note, section 10(b)(ii), (c).

8. Note, section 10(j)(iii).

9. Then known as Provident, now known as SCI Loan Services, LLC.

10. See Seacoast Exhibit 9.

11. See Seacoast Exhibit 11.

12. See Debtor's Exhibit 2 and the objection to confirmation (docket # 115) filed by the Equity Investors.

38 funeral homes [13] would be marketed and sold by private sale.[14] If any of the properties remained unsold on December 31, the property would be auctioned to the highest bidder. SCI–L would retain its security interest and right to be paid any proceeds received by the Debtors from the sales. SCI–L agreed that it would not seek collection of any of the remainder of its claim except from such sales proceeds. Cash collateral to be used for payments to creditors (other than SCI–L) amounts to approximately $1.5 million.

**Summary of Classification of Claims, Plan Treatment, and Acceptance/Rejection**

| | Accept/ Reject | Number— % Voting For | Claims— % Voting For | Amount to be Paid | Percent of Claim Paid |
|---|---|---|---|---|---|
| Class 1 SCI–L | Impaired, Insider, Accepts | | | Approx. $21.5 million (Note 1) | 61% |
| Class 2 Priority | Unimpaired | | | Approx. $4,440 | 100% |
| Class 3 Unsecured Trade Creditors | Impaired/ Accepts | 100% | 100% | Approx. $400,000 | 100% |
| Class 4 Other Unsecured Creditors | Impaired | 20% (Note 2) | 11% (Note 2) | Approx. $100,000 | 1% (Note 3) |
| Class 5 Ford Motor Credit | Unimpaired | | | Approx. $66,443 | 100% |
| Class 6 Stillwater National Bank | Unimpaired | | | Approx. $66,443 | 100% |
| Class 7 Equity | Deemed to Reject | | | Nothing | |

Note 1: SCI–L will receive all of the value of the company ($23 million) less approximately $1.5 million to be used to fund other payments under the plan.

**13.** *See* Debtors' Exhibits 6 and 7.

**14.** Mr. Allen testified that there were two reasons why SCI–L did not propose to purchase all of the funeral homes. With respect to one of them, there is a restraint of trade issue that appears to preclude SCI–L from acquiring the property. With respect to the other ten, there appear to be disputes over the degree to which the vendors claims are subordinated to SCI–L. With respect to at least one group of vendors, (the Stumpff family) there is apparently a proposed settlement that would involve purchase of the home by the vendor. (*See* Limited and Partial Objection of Stumpff Family, docket # 113.) The Plan, as originally filed on May 17, provided that these homes would be surrendered to the secured lender holding primary liens on the properties. The Modification filed June 1 provides that the Debtor will market these homes for six months, and will file a motion to sell them if an offer is acceptable to both the Debtors and SCI–L. Sales proceeds are to be paid to SCI–L.

Note 2: For reasons set forth below, the Court concludes that the votes of the Stumpff group should not be counted but the Subordinated Investor votes should be counted. Debtors counted and recounted the Class 4 votes, but even after the recount the report was admittedly incorrect. The percentages related in the table are reasonably close to the correct count based on the Court's determination that the votes of Subordinated Investors should be counted, but not the votes of the Stumpff group.

Note 3: $100,000 divided among total claims of $10,469,737.51 listed for class 4 in Debtor's revised vote tally.

Mr. Allen, Debtors' president, testified that the Debtors' initial business plan was to acquire funeral homes in leveraged transactions and then sell to sell stock in the new business. It appears that the business plan was formulated and implemented during a period of what Alan Greenspan might call "irrational exuberance." Not very long after the leveraged acquisitions, the capital markets would no longer support sales of equity interests or allow refinancing. The Debtors could not support the substantial debt incurred to make the acquisitions, and bankruptcy followed.

Mr. Allen testified that the Plan was designed to maximize the value of the funeral homes, to pay trade claims in full (to maximize the value of the ongoing businesses), and to pay some minimal amount to other unsecured creditors. Mr. Allen testified that if trade creditors were not paid, the funeral home operations would terminate or suffer substantially, thereby reducing the value of those assets. Mr. Allen's testimony was credible and uncontradicted. The Court finds Mr. Allen's testimony to be true, in general concept.

Preservation of the value of the funeral homes would be a substantial benefit for SCI–L, since it would be acquiring 27 of the 38 funeral homes under the Plan. SCI–L would acquire the funeral homes as going concerns with local goodwill intact. Therefore the homes would have more val-

ue than they would have as defunct, foreclosed properties. SCI–L would also benefit from preservation of the value of the other funeral homes since SCI–L retains its lien with respect to those funeral homes and would be paid the sales proceeds. However, to the extent that Subordinated Vendors repurchase their funeral homes, or to extent that others purchase them, those purchasers will also benefit from preservation of value.

Mr. Allen testified that the trade creditors in Class 3, who will be paid in full, include small creditors, local to the community, such as ministers, cemeteries, florists, organists, and others whose continuing services and goodwill are essential to the continuation of the funeral home businesses. The Court finds that part of this testimony is correct. Most of the creditors in class 3 hold relatively small claims. Debtor's Exhibit 8 shows about 59 trade creditors, of which only 3 have claims in excess of $7,500. Most of the claims appear to be less than $3,000. However, the Court does not find that these claimants are typically individuals who would be severely injured if they were not paid in full and who would withhold future services, thereby reducing the value of the funeral homes. The majority of the claims in Class 3 appear to be held by creditors that are national entities with respect to whom these claims would not appear to be significant.[15] Mr. Allen testified that many of

---

**15.** Names such as Batesville Casket Co., NEC America, Inc., American Express, Clarion Hotel, Federal Express, GE Capital, Greatameri-

ca Leasing, MCI WorldCom Chicago, MCI WorldCom Louisville, Ramada Inn, Robert Half, Southwestern Bell, Standard Insurance

the larger claims were national casket and vault providers with whom SCI–L's parent does substantial business.[16]

The Plan was designed by persons controlled by SCI–L. SCI–L is affiliated with SCI, a competitor of the Debtors, which is one of the largest funeral home operators in the country.

The value of the Debtor's assets, *en globo,* as a going concern, is approximately $23,000,000. The liquidation value is approximately $12,000,000.

Based on Mr. Michell's uncontradicted and credible testimony, the Court finds that the plan is feasible. There are sufficient funds to make the payments called for in the plan.

## EMERGENCY MOTION TO MODIFY THE PLAN

■ Paragraph 6.2 of the Plan (the Second Amended Plan as originally filed) provides that "substantially all" of the funeral homes and related assets are to be sold to SCI–L, and that any funeral homes not sold to SCI–L are to be sold to the secured lender holding a lien on that property. The provision appears to be designed to allow consummation of the plan with reservation of disputes over subordination agreements to be worked out with lenders asserting claims allegedly secured by those funeral homes.

On June 1, the plan proponents filed an emergency motion to modify the Plan to provide that the Debtor would continue to operate the eleven funeral homes while they were marketed. The Modification provides that when the Debtors and SCI–L receive an offer acceptable to both of them, they will file a motion with the bankruptcy court to authorize the sale. If the funeral homes are not sold by December 31, 2001, they are to be auctioned off. Debtors' Exhibit 7 lists the funeral homes that will not be sold to SCI–L on the effective date, and thus will be disposed of under the provisions of the Modification.

The Modification does not alter the plan provision with respect to any class of creditors except SCI–L and possibly the Subordinated Vendors who did not oppose the Modification. No objections were filed to the emergency motion to modify. No objections were raised at the confirmation hearing on June 12. No party requested the right to change votes based on the Modification.

Bankruptcy Code Section 1127 provides that the plan proponent may modify the plan at any time prior to confirmation, provided that the plan proponent complies with plan disclosure requirements. The Court finds that the modification is immaterial and appropriate without further disclosure. Therefore the Modification is allowed, and the modified plan becomes the Plan.[17]

## DISPUTED ISSUES

*Motion to Disqualify Votes of Subordinated Investors*

■ The Equity Investors, in their capacity as Subordinated Investors, voted against the plan and objected to plan con-

Co., Office Depot, CT Corporation System, *etc.* suggest that a large number of the claims in Class 3 are held by creditors who are not local ministers, organists, *etc.*

16. There was argument at some point that the (relatively small) communities in which these homes were located would benefit because jobs would be saved and because some members of those communities had prepaid funeral arrangements that would be honored. However, there was no evidence introduced on these issues, and therefore the Court does not make that finding.

17. *See* Bankruptcy Code Section 1127(a).

firmation. The Plan proponents moved to disqualify the votes of the Subordinated Investors, alleging that Section 10 of the Notes prohibits the Subordinated Investors from voting against any plan so long as the Senior Indebtedness is not paid.

■ The Subordinated Investors do not deny that their claims are subordinated, and there is no dispute about the subordination language in the Notes. No one seems to dispute, and the Court recognizes, that subordination agreements are enforceable in a bankruptcy case. The question is whether the Subordinated Investors are voting their claims in violation of Section 10 of the Note.

The thrust of Section 10 is that the Senior Indebtedness is to be paid in full prior to the payment of any funds to the Subordinated Investors and that Subordinated Investors may not act in any way to prevent the Senior Indebtedness from being paid. Specifically, the subordination agreement prohibits the Subordinated Investors from voting their claims in any manner inconsistent with the subordination agreement. However, it is not clear that Section 10 prohibits the Subordinated Investors from voting against a plan that allows payment of trade debt in preference to payment of the Subordinated Investors. Section 10 explicitly provides that the claims of the Subordinated Investors are *not* subordinated to other unsecured claims. Therefore, to give effect to *all* of Section 10, the Court concludes that the Subordinated Investors are not prohibited from voting against a plan that subordinates them to trade creditors of equal rank. The Subordinated Investors would

be prohibited (i) from voting against a plan that provided for payment of all funds to SCI–L and (ii) from voting against a plan that provided for equal payment to trade creditors and other unsecured creditors. However, the Plan provides for greater payment to trade creditors than to the Subordinated Investors. This violates Section 10 of the Notes. Consequently a vote against such a plan is in accordance with Section 10, not violative of it.[18]

In addition, the subordination provision appears to be limited to $20 million.[19] As noted in the findings of fact, it appears that the distribution to SCI–L will approximate $21.5 million ($23 million less $1.5 million that is being paid to other· creditors.) Therefore, while there was no direct evidence presented on this point, the Court concludes from the valuation evidence that the proposed distribution is more than the amount to which the Subordinated Investors are contractually subordinated. Therefore the Court concludes that the Subordinated Investors are not prohibited from voting against the Plan.

*Motion to Disqualify Votes of Stumpff Group*

■ Gerald Pace filed a motion to disallow the votes of the Stumpff group. Pace asserts that these creditors are secured creditors because their claims were filed as secured claims and no objection to the claims has been filed. This motion, like the motion to disqualify the votes of the Subordinated Investors, came up for emergency consideration. Different conclusions might be reached if time were allowed for

---

18. The plan proponents also argue that under Section 10 the Subordinated Investors are required to deliver to the Senior Lender any funds that they receive prior to payment of the Senior Lender's entire claim. That is an issue that the Court is not required to address, at least not yet.

19. The language of the Notes is "$20,000,000 million ..." The Court believes that this is an obvious typographical error. Surely the parties did not intend to limit the subordination to $20,000,000,000,000.

objections to claims and adjudication of the status of the claims.

For present purposes, however, the Court must accept the status of the bankruptcy case and claims filed in it. The Stumpff claims are filed as secured claims. The Stumpff family has asserted in their pleadings that they are secured creditors. There is no objection to their claims and there is no motion to estimate their claims or to reclassify their claims for voting purposes. The plan proponents assert that the Plan treatment of the Stumpff claims as unsecured claims and the disclosure statement treatment of the Stumpff claims as unsecured claims is sufficient to classify them as unsecured claims for plan confirmation purposes. In addition, the plan proponents indicate that the Stumpff family has agreed to resolve the dispute over their subordination agreement by agreeing to repurchase their funeral homes and waive any distribution under class 4.

The Court cannot accept the argument that these pleadings are sufficient to classify the Stumpff family claims as unsecured claims. The existing proofs of claim are *prima facie* proof. There has been no appropriate challenge to their secured status. For present purposes the claims are secured claims and cannot vote in class 4.[20]

*Conclusions Concerning Plan Acceptance*

Bankruptcy Code Section 1126 provides that a class accepts a plan if more than 50% of the creditors in that class vote in favor of the plan and if the creditors voting in favor of the plan hold at least ⅔ of the claims in that class. Classes that are unimpaired are deemed to accept the plan and classes that receive nothing under the plan are deemed to reject.

As shown in the chart, all classes except Classes 4 and 7 have accepted the plan.

*Objections to the Plan*

The Court received four objections to confirmation. Except for the plan proponents, however, only the Equity Investors offered any evidence. The Court will not consider the factual allegations in the objections as to which no evidence was introduced at the plan confirmation hearing. The Court will summarize the legal objections and then set forth its conclusions.

The four objections raise three legal issues with respect to plan confirmation.

1.  The objections assert that separate classification of unsecured trade creditors in class 3 and classification of other unsecured creditors in class 4—

    a.  Violates Bankruptcy Code Section 1122 by separately classifying similar claims for the purpose of obtaining a consenting class, and

    b.  Precludes a finding of good faith and therefore precludes confirmation.

2.  The objections assert that payment of 100% of the trade creditors' (Class 3) claims is not fair and equitable and unfairly discriminates against other unsecured creditors (Class 4) who receive 1% of these claims because the creditors have equal rank under state law and equal distribution priorities under the Bankruptcy Code.

3.  The objections assert that paragraph 12.1 of the Plan violates Bankruptcy Code Section 1141(d)(3) because it provides for application of

---

**20.** The Stumpff family indicates that it will waive distribution under Class 4 because of a proposed settlement with the Debtor regarding repurchase of their funeral homes. The Court has some doubt about the propriety of a creditor voting in a class, but waiving a distribution under that class because of a separate settlement of a dispute. Since that issue is not critical to the current decision, the Court declines to address that issue at this point.

Bankruptcy Code Section 1141(d), a discharge, to a liquidating corporate debtor.

### Conclusions

Bankruptcy Code Section 1129 provides that the Court shall confirm a plan only if it meets the requirements set forth in § 1129(a). There is really no dispute about compliance with any of those provisions except § 1129(a)(1), (3), (8) and (10). On all other requirements, the Court received evidence and finds that those requirements are satisfied. The Court will comment on some of these even when there was no substantial dispute.

A. Section 1129(a)(1). The plan complies with the applicable provisions of title 11.

Except for classification of claims, there is no dispute about compliance with the provisions of title 11. The Court has reviewed the Plan and concludes that the plan complies with title 11, except for Bankruptcy Code Section 1122.

■ Section 1122 prohibits common classification of claims unless they are substantially similar. Section 1122 does not prohibit separate classification of similar claims, and even expressly authorizes separate classification of small claims. Most of the commentators agree that § 1122 is permissive of any classification scheme that is not proscribed, and that substantially similar claims may be *separately*

classified.[21] If there are any impaired classes of creditors in a chapter 11 plan, the Bankruptcy Code provides that the plan cannot be confirmed unless at least one impaired class accepts the plan.[22] This requirement has led to a number of creative efforts to classify creditors, especially in small real estate cases when one lender holds a huge deficiency claim and is hostile to plan confirmation. Many courts have addressed the question of whether a secured lender's unsecured deficiency claim (which rejects the plan) can be separately classified from unsecured trade claims that might accept the plan.

■ Binding precedent on the classification of claims in this circuit is *In the Matter of Greystone III Joint Venture*[23] and *In the Matter of Briscoe Enterprises, Ltd., II.*[24] *Greystone* appears to recognize that separate classification of unsecured claims might be permissible.[25] But the Court held that separate classification must have a basis independent of the plan proponent's efforts to secure a class of claims that will accept the plan.

> We conclude that if § 1122(a) permits classification of 'substantially similar' claims in different classes, such classification may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, dissenting class of claims.[26]

*Greystone* thus defines one motive of classification (gerrymandering) that is *not*

---

21. *See* 7 COLLIER ON BANKRUPTCY, ¶ 1123.03[1][a] (15th ed. rev.1999).

22. *See* Bankruptcy Code Section 1129(a)(10).

23. 995 F.2d 1274 (5th Cir.1991).

24. 994 F.2d 1160 (5th Cir.1993).

25. The opinion does not state that the lower courts were wrong in holding that § 1122 was permissive, it states that the lower court's

analysis was "oversimplified." The opinion then declines to impose an absolute rule, and states that "A fair reading of both subsections suggests that *ordinarily* 'substantially similar claims,' those which share common priority and rights against the debtor's estate, should be placed in the same class." *Greystone*, 995 F.2d at 1278. [Emphasis supplied.]

26. *Id.* at 1279.

permissible, unless there is another independent basis. The Court's task now is to ascertain the Plan proponent's motive and to determine whether that motive is permissible and is sufficient as an independent reason for the classification schedule.

*Greystone* gives mixed signals about whether unequal treatment of equal claims is permissible. In one statement, the court indicated that creditors with similar claims must be put in the same class so that they will receive equal treatment.[27] In another passage, the court suggests that different treatment of equal claims would be evidence of *valid grounds* for separate classification.

*Greystone's* justification for separate classification of the trade claims might be valid if the trade creditors were to receive different treatment from Phoenix. Indeed, *Greystone* initially created a separate class of unsecured creditors that could be wooed to vote for the plan by the Promise to pay their remaining claims in full *outside the plan. Greystone* then changed course and eliminated its promise. Because there is no separate treatment of the trade creditors in this case, we reject *Greystone's* 'realities of business' argument.[28] [Emphasis, but not italics, supplied.]

■■■ Logically, as *Greystone* suggests, differential classification of equal claims should be tested by whether the classification is designed to achieve a result that is permissible under the Bankruptcy Code. If the purpose is not proscribed, one would not expect that separate classification would be proscribed, *per se. Greystone* also suggests that preservation of value may be a permissible purpose. But explicit in the *Greystone* analysis is the require-

ment that the class definitions must be drawn sufficiently narrowly so that the classification scheme will not materially serve a proscribed purpose.

The plan proponents presented testimony that their classification scheme was designed to preserve and to enhance the value of assets to be sold under the plan. The Court concludes that this purpose is permissible, and therefore the classification of creditors in the plan would be permissible if the classification were sufficiently narrowly drawn to achieve the stated purpose.

In this case the plan proposes to pay, in Class 3, many entities that do not appear to be related to the ongoing goodwill and continued operations of the funeral homes. Even assuming that the evidence were adequate to show that it is essential to pay organists, ministers, flower shops, and other small-town businesses, the classification of creditors under the Plan is simply not limited to that purpose. Although it appears that the permissible purpose of preserving value would be served, it also appears that proscribed purpose of gerrymandering (or paying creditors for the benefit of SCI–L's parent) would also be materially served.

Therefore, the Court concludes that the Plan proponents have not met their burden to prove that Class 3 is appropriately designed to implement the announced purpose of enhancing the value of the assets. Since the Court concludes that Class 3 was not defined properly to achieve the permitted purpose, the Court finds that the classification violates Bankruptcy Code Section 1122 and the rule in *Greystone.*

---

**27.** "Proper classification is essential to ensure that creditors with claims of similar priority against the debtor's assets are treated similarly." *Id.* at 1277.

**28.** *Id.* at 1280.

B. Section 1129(a)(3). The plan has been proposed in good faith and not by any means forbidden by law.

■ The Court has reviewed the evidence and concludes that the plan was proposed in good faith and not by any means forbidden by law. With respect to good faith, the Court specifically finds that the proposal of this plan was largely based on a desire to maintain maximum value of ongoing businesses. The Court concludes that the Plan's failure to meet the requirements of § 1122 is not necessarily lack of good faith.

C. Section 1129(a)(7)—any entity that has not accepted the plan will receive at least as much as that entity would receive in a chapter 7 liquidation.

■ Because SCI–L holds liens on all property of the estate and is undersecured, there appears to be no value available for any other creditors or interest holders in this case. Therefore the liquidation test is met for all classes.

D. Section 1129(a)(8)—each class has accepted the plan or is not impaired.

Classes 4 and 7 are impaired and have not accepted the plan. Therefore, the requirements of Bankruptcy Code Section 1129(b) must be met.

E. Section 1129(a)(10)—At least one impaired class has accepted the plan.

Because the Court concludes that Class 3 was improperly classified, and because Class 3 is the only impaired class accepting the plan (excluding the affirmative votes of insiders), the Court cannot find that an impaired class has accepted the plan.

F. Section 1129(b) provides that if the plan meets all of the requirements for plan confirmation except § 1129(a)(8), the plan may nevertheless be confirmed if the plan is fair and equitable and does not discriminate unfairly against Class 4.[29]

■ The statute defines "fair and equitable" for unsecured creditors. The plan is fair and equitable as to them if no junior class receives or retains anything under the plan. In this case, no class junior to Class 4 receives or retains anything of value under the plan and therefore the Plan is fair and equitable as to Class 4.

Bankruptcy Code Section 1129(b) does not define "discriminate unfairly." In this case, the issue is whether the Plan discriminates unfairly by proposing to pay a greater percentage distribution to Class 3 creditors than it pays to Class 4 creditors, even though both have equal rank under state law and under the distribution priorities of the Bankruptcy Code. It is clear that the Plan discriminates between the two groups of creditors since it proposes to pay one set 1% of their claims and it proposes to pay the other group 100%.

The Plan proponents argue that SCI–L has a lien on all assets and therefore the Plan does not discriminate unfairly because Class 4 has no legal right to a distribution. They argue that SCI–L is merely giving up part of its entitlement, and that Class 4 has no legal right to complain. The Plan proponents cite *In re MCorp Financial, Inc.*[30] That decision states:

> The seniors may share their proceeds with creditors junior to the juniors, as

---

**29.** Although it would appear that this discussion is unnecessary if the Court concludes that other requirements of § 1129(a) are not satisfied, that is not correct. In order to determine whether the classification of creditors is proper, the Court believes that, in this case, it must determine whether the proponents' motive in designing the classification scheme is permissible to achieve a plan that could be crammed down under § 1129(b).

**30.** 160 B.R. 941 (S.D.Tex.1993).

long as the juniors continue to receive as (sic) least as much as what they would without the sharing.[31]

The Court finds *MCorp* not to be dispositive on this issue, however. In that case, the issue did not involve payments to a class of creditors under a plan. The case involved approval of a settlement, albeit through confirmation of a plan of reorganization. In *MCorp*, the FDIC had sued the debtor for about $300 million. The debtor had counterclaimed and filed separate suits against the FDIC for about $500 million. The plan provided that the Debtors would settle the suit by payment of about $34 million to the FDIC. The plan also proposed payment of Senior unsecured creditors in full and payment of a minimal amount to Junior unsecured creditors. The Junior unsecured creditors rejected the plan and objected to cramdown on the basis that the plan discriminated unfairly and was not fair and equitable. The decision never addressed the relative priorities between the FDIC and the juniors.

The Plan proponents also rely on *Brinkley v. Chase Manhattan Mortgage & Realty Trust*.[32] That case does indeed hold that trade creditors may be separately classified and paid more than insider unsecured creditors. However, this case was decided under chapter XII of the Bankruptcy Act and does not interpret the limitations of "does not discriminate unfairly" in § 1129(b) of the Bankruptcy Code.

█ In general, the Bankruptcy Code is premised on the rule of equality of treatment. Creditors with claims of equal rank are entitled to equal distribution.[33] But § 1129(b) obviously permits *some* discrimination, since it only prohibits *unfair* discrimination. The task is to determine what constitutes "fair" discrimination.

A very persuasive historical analysis and proposed test is presented by Bruce A. Markell, entitled *A New Perspective on Unfair Discrimination in Chapter 11* (hereafter "Markell").[34] In that article, Markell observes that:

> ... [U]nfair discrimination is best viewed as a horizontal limit on nonconsensual confirmation ... Just as the fair and equitable requirement regulates priority among classes of creditors having higher and lower priorities, creating inter-priority fairness, so the unfair discrimination provision promotes intra-priority fairness, assuring equitable treatment among creditors who have the same level of priority.[35]

█ Markell proposes the following test:

> In particular, I propose that a Chapter 11 plan is presumptively subject to denial of confirmation on the basis of unfair discrimination, even though it provides fair and equitable treatment for all classes, when there is (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to

---

31. *Id.* at 960.

32. 622 F.2d 872 (5th Cir.1980).

33. *See American United Mut. Life Ins. Co. v. City of Avon Park, Florida*, 311 U.S. 138, 147, 61 S.Ct. 157, 85 L.Ed. 91 (1940); *Begier v. IRS*, 496 U.S. 53, 58, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990).

34. Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 Am Bankr.L.J. 227 (1998).

35. *Id.* at 227.

the dissenting class in connection with its proposed distribution.[36]

▮ Under this test, the Plan is "presumptively subject to denial of confirmation." However, Markell suggests that the presumption can be overcome by proof of one of two exceptions.

> The plan proponent may overcome the presumption based on different percentage recoveries by showing that a lower recovery for the dissenting class is consistent with the results that would obtain outside of bankruptcy, or that a greater recovery for the other class is offset by contributions from that class to the reorganization.[37]

At first blush, the first exception might seem to cover this Plan: "a lower recovery for the dissenting class is consistent with the results that would obtain outside of bankruptcy."[38] But nowhere in the article does Markell suggest that a secured lender may simply purchase the assent of an unsecured class by giving up part of its claim. Markell seems to suggest that the "results that would obtain outside of bankruptcy" has to do with pre-petition status of creditors and their legitimate expectations about relative rights and likelihood of payment.[39] His example of appropriate discrimination between trade claims in one class and deficiency claims of a non-recourse secured creditor in another class. The discrimination is justified in this example because outside of bankruptcy the non-recourse creditor has no expectations of recovery on its deficiency claim. Since *any* recovery in bankruptcy is more than the creditor would get outside of bankruptcy, discriminatory treatment may not be unfair.[40]

In the Plan, there is no such justification for gross discrimination between the percentage payouts to Classes 3 and 4. Class 3 contains some small creditors whose continued work with the funeral homes would probably provide some value. However, Class 3 contains many more national creditors (some of them very large) who appear to be paid for reasons other than preservation of value. Thus there does not appear to be sufficient "contribution to preservation of value through the plan" that justifies a payout differential. Although there are equity investors in Class 4 who might be paid differently based on expectations and inside information, there are also ex-proprietors of small funeral homes in Class 4 who sold businesses to the Debtor and did not share control or insider information. While a deferred payout and possibly risk differential among the different kinds of creditors in this case might be justified, a 99% payout differential is not justified.

Adopting the Markell proposal, the Court concludes that the plan discriminates unfairly.

G. SCI–L argues that distributions that favor Class 3 over Class 4 are not unfair discrimination because SCI–L has a security interest in all of the Debtor's property. Since Class 4 would not receive any distribution if SCI–L were merely to foreclose on its liens and security interests, Class 4 cannot be heard to complain that it is receiving less than Class 3.

SCI–L's argument does not address specific statutory confirmation requirements.

---

36. *Id.*

37. *Id.*

38. *Id.*

39. "... [T]he plan proponent can rebut the presumption of unfairness by proving that the difference in treatment is attributable to differences in the prepetition status of the creditors." Markell, at 250.

40. *See* Markell, at 257.

It is made as an umbrella argument for confirmation of the plan notwithstanding discriminatory plan treatment. This argument has caused the Court the most concern. However, after review of the origins of the "unfair discrimination" rule in § 1129(b) and after consideration of the functions and relationship of different subsections of § 1129, the Court concludes that the argument is a siren's song that is insufficient as a foundation for plan confirmation.

As Markell notes, chapter 11 reorganizations arose out of equity receiverships. As a creature of equity, fairness (expressed as equality of distribution or opportunity to participate) was a fundamental requirement. That concept was explicit until 1938, and was reintroduced into the law in 1978 with the passage of the Bankruptcy Code.[41] Therefore Markell is persuasive when he argues that one should look to equity receiverships for guidance in defining the requirement that a plan "not discriminate unfairly".

■■■ Even more persuasive is the interrelationship of creditor protections evidenced in the statutory confirmation requirements. Bankruptcy Code § 1129(a)(7) protects all creditors in all classes against receiving less than what they would receive in liquidation, even if their class were to accept the plan. The "fair and equitable" requirement of 1129(b) protects each class of creditors against involuntary loss of their priority status, vis a vis other classes of different rank. The "does not discriminate unfairly" requirement in § 1129(b) protects each class of creditors against involuntary loss of their equal distribution rights vis a vis other creditors of equal rank.

To accept SCI–L's argument that a secured lender can, without any reference to fairness, decide which creditors get paid and how much those creditors get paid, is to reject the historical foundation of equity receiverships and to read the § 1129(b) requirements out of the Code. If the argument were accepted with respect to § 1129(b) "unfair discrimination requirement," there is no logical reason not to apply it to the § 1129(b) "fair and equitable" requirement, or to the § 1129(a)(10) requirement that at least one class has accepted the plan. To accept that argument is simply to start down a slippery slope that does great violence to history and to positive law.

There are devices at law, such as foreclosure, in which the secured lender is not required to negotiate with unsecured creditors, to obtain consent of at least one class of impaired creditors, or to be fair. But the advantage of an equity receivership, and its descendant the chapter 11 reorganization, is (among others) (i) that going concern value is preserved or enhanced, (ii) that the debtor (in this case in league with the secured lender) is left in possession and control of the business to decide how to restructure it, (iii) that executory contracts can be assumed or rejected, (iv) that preferences and fraudulent conveyances can be recovered, and (v) that all

---

41. Therefore, SCI–L's reference to In re Leblanc, supra, a case decided under the Bankruptcy Act, is not apposite. SCI–L also cites Anderson, Classification of Claims and Interests in Reorganization Cases Under the New Bankruptcy Code, 58 Am.Bankr.L.J. 99, 117 (Spring, 1984) which is not persuasive. First, SCI–L cites that article for authority that discriminatory payment of equally ranked creditors is appropriate under the Bankruptcy Code because it was possible under the Bankruptcy Act. The fact of separate classification appears to be a different issue from discriminatory treatment. Second, the Bankruptcy Act as it existed shortly before the enactment of the Code would not appear to be proper authority since the "does not discriminate unfairly" language was reintroduced into the Bankruptcy Code after a 40 year absence from the Act.

other creditors are held at bay under an automatic stay while the plan is formulated and implemented. The Bankruptcy Code establishes the price of these powerful equitable tools (when any class of creditors is impaired) as negotiation to win over the acceptance of an impaired class and treatment of all non-accepting classes fairly, equitably, and without unfair discrimination. SCI–L proposes to obtain the benefits of equitable tools without paying the price. The statute has no provision for that, and the Court is unwilling to read these requirements out of the Code.

The Court, at this point, is not required (or able) to define the limits of "unfair discrimination" in this case. The plan, as indicated above, fails to meet other confirmation requirements. The fact that Class 4 creditors would receive nothing in a liquidation might or might not be influential under the right circumstances. All that the Court need determine at this stage is that the dire financial consequences of foreclosure is not sufficient to sustain a finding that the proposed discriminatory Plan treatment of Class 4 is fair and equitable.

H. It is uncontested that the Plan is fair and equitable and does not discriminate unfairly against Class 7, the equity interests.

## CONCLUSION

The plan does not meet all of the confirmation requirements of Bankruptcy Code Section 1129. Therefore, by separate order issued this date, plan confirmation is denied. To consider additional orders for the expedient and economical prosecution of this case, the Court will conduct a status conference under Bankruptcy Code § 105(d).